**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 6, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

FORREST DARYL TEMPLETON,

     Plaintiff Counter Defendant - Appellant,

v.

CATLIN SPECIALTY INSURANCE COMPANY,

     Defendant Counterclaimant – Appellee,

and

H. THOMAS FEHN; ORLY DAVIDI; GREGORY J. SHERWIN; FIELDS, FEHN & SHERWIN,

     Defendants.
_____

FORREST DARYL TEMPLETON,

     Plaintiff Counter Defendant - Appellant,

v.

DALE K. HALL,

     Defendant - Appellee,

and

CATLIN SPECIALTY INSURANCE COMPANY; H. THOMAS FEHN; ORLY

No. 14-1261
(D.C. No. 1:12-CV-00859-RPM)
(D. Colo.)

14-1381
(D.C. No. 1:12-CV-00859-RPM)
(D. Colo.)

DAVIDI; GREGORY J. SHERWIN;
FIELDS, FEHN & SHERWIN,

      Defendants.

_____

FORREST DARYL TEMPLETON,

      Plaintiff Counter Defendant -
      Appellant,

v.

H. THOMAS FEHN; ORLY DAVIDI;
GREGORY J. SHERWIN; FIELDS,
FEHN & SHERWIN,

      Defendants - Appellees,

and

CATLIN SPECIALTY INSURANCE
COMPANY,

      Defendant - Counterclaimant,

and

 DALE K. HALL,

      Defendant.

14-1453
(D.C. No. 1:12-CV-00859-RPM)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

_____

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Before **TYMKOVICH**, **MATHESON,** and **MORITZ**, Circuit Judges.

---

Forrest Daryl Templeton was a licensed securities broker.  Between 2004 and 2007, he sold high-risk investments to Robert and Lisa Cordaro.  Mr. Templeton sold one of those investments, a secured note in Medical Providers Financial Corporation IV ("MedCap IV"), while he was a registered representative for CapWest Securities, Inc. ("CapWest").  After the investments failed, the Cordaros filed claims against Mr. Templeton, CapWest, their former broker-dealer, and others with the Financial Industry Regulatory Authority ("FINRA"), which resolves disputes between broker-dealers and their customers through arbitration.

Catlin Specialty Insurance Company ("Catlin") insured Mr. Templeton and CapWest under an errors and omissions policy (the "Policy").  The Policy covered claims against Mr. Templeton and CapWest regarding sales of securities while Mr. Templeton was a registered representative at CapWest.  Catlin agreed to defend Mr. Templeton and CapWest against the Cordaros' claim subject to a reservation of rights.

Catlin retained counsel for Mr. Templeton and CapWest, but the law firm it retained withdrew after a dispute with CapWest over legal fees.  A dispute ensued between Catlin and CapWest over replacement counsel.  CapWest requested Catlin to retain Fields, Fehn & Sherwin ("FF&S"), which had been serving as general counsel for CapWest in the Cordaro matter.  Catlin objected but eventually gave FF&S limited authority to attempt to settle with the Cordaros.

Shortly before the FINRA arbitration hearing, FF&S negotiated a settlement, which resulted in the Cordaros dismissing CapWest—but not Mr. Templeton—from the FINRA proceeding. Mistakenly believing the settlement had also resolved the claims against him, Mr. Templeton did not attend the FINRA arbitration hearing. The arbitration panel awarded the Cordaros $500,000 in damages, plus interest and costs.

Mr. Templeton paid the Cordaros $555,000 to settle the arbitration award. He then initiated this action in the District of Colorado against Catlin; Dale Hall, the President and Chief Executive Officer of CapWest; FF&S; and FF&S attorneys H. Thomas Fehn, Orly Davidi, and Gregory Sherwin (collectively with FF&S, "attorney-defendants"). The district court granted Mr. Hall's motion to dismiss and Catlin's and FF&S's motions for summary judgment, thereby dismissing all of Mr. Templeton's claims against the defendants. Mr. Templeton now appeals those orders.

Mr. Templeton argues the district court erred when it: (1) dismissed his negligent misrepresentation claim against Mr. Hall, (2) granted summary judgment to Catlin on his indemnification claim and Catlin's counterclaim, (3) granted summary judgment to Catlin on his breach of the duty to defend claim, and (4) granted summary judgment to the attorney-defendants on his legal malpractice and breach of fiduciary duty claims. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm on the first, second, and fourth

-4-

issues, and affirm in part and reverse and remand in part on the third issue.[1]

## I. BACKGROUND

### A. *Factual Background*

1. **Mr. Templeton Sells Securities to the Cordaros**

From February 14, 2002 to September 15, 2005, Mr. Templeton worked as a registered representative for United Securities Alliance, Inc. ("USA"). During that time, he established a broker-customer relationship with the Cordaros. Between June 2004 and August 2005, Mr. Templeton sold the Cordaros the following five private placement investments totaling $515,000: In June 2004, the Cordaros purchased (1) a $100,000 three-year note and (2) a $130,000 five-year note in Medical Provider Financial Corporation II ("MedCap II"), a subsidiary of Medical Capital Holdings, Inc. ("MedCap Holdings"); (3) a $150,000 investment instrument in Triple Net NNN 2003 Value Fund LLC ("Triple Net"); and (4) a $100,000 investment instrument in DBSI State Office Fund, LLC ("DBSI"). In August 2005, they purchased an additional (5) $35,000 five-

---

[1] Mr. Templeton initially filed a notice of appeal as to the Catlin judgment (No. 14-1261) before final judgment as to all defendants and without district court approval under a Federal Rule of Civil Procedure 54(b) certification. Catlin moved to dismiss the appeal because the judgment was not final. At Mr. Templeton's request, the district court subsequently entered a Rule 54(b) certification as to its judgments against Catlin and Mr. Hall, making Mr. Templeton's appeal as to Catlin valid. Mr. Templeton also filed a notice of appeal of the judgment in favor of Mr. Hall at that time (No. 14-1381). After the district court granted summary judgment to the attorney-defendants, it entered a final judgment dismissing the action. Mr. Templeton then filed a notice of appeal as to the attorney-defendants (No. 14-1453). The motion to dismiss is denied as moot because the judgment as to all defendants is now final and appealable.

year note in MedCap II.  In total, the Cordaros invested $265,000 in MedCap II while Mr. Templeton was employed with USA.

On September 16, 2005, Mr. Templeton began working at CapWest.  The Cordaros transferred their investment account to CapWest.  In June 2007, the Cordaros' investment on their $100,000 MedCap II note matured.  They worked with Mr. Templeton to reinvest the $100,000 they received into a seven-year note in Medical Provider Financial Corporation IV ("MedCap IV"), another subsidiary of MedCap Holdings.  CapWest was the broker-dealer on the MedCap IV transaction.

In fall 2008, the Cordaros stopped receiving payments on all of their investments with Mr. Templeton, including the MedCap IV investment.

In July 2009, the U.S. Securities and Exchange Commission ("SEC") sued MedCap Holdings for violating federal securities laws.  In August 2009, the district court appointed a temporary receiver and then a permanent receiver for MedCap Holdings and its subsidiaries, including MedCap IV.  The court's orders also froze MedCap IV's assets.

2. **The Cordaros Initiate the FINRA Action**

On November 18, 2009, the Cordaros filed a statement of claim with FINRA against Mr. Templeton, CapWest, USA, and USA's principals for Mr. Templeton's sales of the Triple Net, DBSI, MedCap II, and MedCap IV notes.  The Cordaros demanded arbitration and sought to recover the $515,000 they had invested with Mr. Templeton, claiming that Mr. Templeton had sold them speculative securities without adequate investigation or disclosure.

The statement of claim described each of Mr. Templeton's sales of securities to the Cordaros, including the MedCap IV note, as to which the Cordaros alleged:

> In 2007, when the [$100,000 MedCap II note] matured, respondent Templeton induced claimants to roll it over into a new, 7 year note for the same amount. By that time, Templeton was working for another broker dealer, CapWest Securities, which is named as a respondent herein by virtue of the offer and sale of that note to claimants.

App. at 790. They alleged the prospectuses for both the MedCap II and MedCap IV sales were inadequate because they did not disclose lawsuits involving a MedCap Holding principal that should have been disclosed and because they included unsupported financial information. They further alleged that Mr. Templeton and CapWest should have known the MedCap IV investment was too risky because it was unsuitable for any customer "who was not a speculator," and the Cordaros specifically told them that "**preservation of capital** was their primary invest[ment] objective." *Id.*

### 3. **Mr. Templeton and CapWest's Insurance Policy**

When the Cordaros filed their FINRA action, Catlin insured CapWest and Mr. Templeton through an errors and omissions policy. The Policy's coverage period was September 1, 2009 through September 1, 2010. The Policy covered:

> Damages which the Insured becomes legally obligated to pay because of a Claim that is both made against the Insured and reported to the Insurer in writing during the Policy Period . . . for a Wrongful Act committed solely in the rendering or failing to render Professional Services for a Client, provided . . . such Wrongful Act occurred on or after the Retroactive Date.

*Id.* at 876 (Policy § I.A).[2] The Policy defined "Wrongful Act" as "a negligent act or omission . . . committed by an Insured in the rendering of Professional Services," *id.* at 882 (Policy § II.V), and "Professional Services" to include a registered representative's "sale, attempted sale or servicing of Securities that are approved and authorized by and actually distributed through the Broker/Dealer," *id.* at 881 (Policy § II.Q.1.b).

The Policy's "Retroactive Date" was defined as the later of January 1, 2005, or the date when the Insured Registered Representative "first entered into an uninterrupted or continuously renewed contract with the Broker/Dealer." *Id.* at 882 (Policy § II.T.2). Mr. Templeton began working at CapWest on September 16, 2005. Thus, the Policy covered claims within the policy period arising from Mr. Templeton's negligent acts or omissions in rendering professional services that occurred on or after September 16, 2005. The Policy therefore potentially provided coverage for the MedCap IV note Mr. Templeton sold to the Cordaros. It did not cover the sales Mr. Templeton made to the Cordaros while employed with USA.

The Policy contained exclusions from coverage, two of which are relevant here—the "Interrelated Wrongful Acts" exclusion ("Exclusion D.1.b") and the "Insolvency/Receivership" exclusion ("Exclusion N"). Exclusion D.1.b stated, in relevant part:

---

[2] The Policy defined "Insured" to include the Named Insured Broker/Dealer, CapWest, and "Insured Registered Representative(s)." App. at 878-79 (Policy § II.K ("Insured(s)"), II.B ("Broker/Dealer"). Mr. Templeton was an Insured Registered Representative.

This Policy shall not apply to and the Insurer shall pay neither Damages nor Defense Expenses for any Claim . . . arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving . . . any Wrongful Act occurring on or after the Retroactive Date which, together with a Wrongful Act occurring on or prior to such Retroactive Date, would constitute Interrelated Wrongful Acts. . . .

*Id.* at 882 (Policy § III.D.1.b). The Policy defined "Interrelated Wrongful Act" as:

 [A]ny Wrongful Acts that are:

1. similar, repeated or continuous; or
2. connected by reason of any common fact, circumstance, situation, transaction, casualty, event, decision or policy or one or more series of facts, circumstances, situations, transactions, casualties, events, decisions or policies.

*Id.* at 880 (Policy § II.M).

Exclusion N excluded from coverage any claim:

arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving insolvency, receivership, . . . or inability to pay of . . . any company, organization, entity, . . . direct private placement, . . . or arrangement of any nature in which any Insureds . . . placed or recommended to be placed funds.

*Id.* at 884 (Policy § III.N).

The Policy also imposed upon Catlin a duty to defend "any civil litigations or arbitrations against the Insureds that are covered by [the] Policy." *Id.* at 876 (Policy § I.B). It provided that Catlin "shall appoint counsel of its selection to defend the Insureds and pay associated Defense Expenses." *Id.* The Policy had a $500,000 aggregate coverage limit, including defense expenses, for claims arising from the sale of private placements, such as the MedCap IV sale, subject to a $100,000 self-insured

retention per claim.

4. **Catlin Agrees to Provide Representation to Mr. Templeton and CapWest in the Cordaro Matter Subject to a Reservation of Rights**

On February 4, 2010, CapWest received the Cordaros' statement of claim, and reported the action to Catlin's claims office a week later. It also notified Mr. Fehn, a general partner at FF&S, who regularly did legal work for CapWest as general counsel. On February 19, 2010, Mr. Hall sent an email to Mr. Templeton and other CapWest registered representatives notifying them that those registered representatives named in FINRA arbitrations would be required to pay 75% of the legal fees incurred in defending those claims.

On May 5, 2010, Catlin's coverage counsel, Richard Rogers, sent a letter to CapWest and Mr. Templeton stating that Catlin would defend them against the Cordaros' claims subject to a "full reservation of rights." *Id.* at 814. The letter explained the relevant coverage provisions of the Catlin Policy, and reserved the right to deny indemnification for the Cordaros' claims to the extent they were not covered. It also said Catlin was reserving its right to deny indemnity based on Exclusion N, because the Cordaro "matter arises f[ro]m Securities that are now insolvent, bankrupt, or in receivership." *Id.* at 819. It also stated that "Catlin further reserves its right to deny coverage for the arbitration, in whole or in part, based on other exclusions contained in the policy, including . . . Exclusion D which applies to claims that were reported or noticed prior to the policy period . . . ." *Id.*

5. **Catlin's Initial Choice of Counsel and Counsel's Withdrawal**

Catlin initially retained the law firm Markun Zusman & Compton LLP ("Markun Zusman") to represent Mr. Templeton and CapWest in the Cordaro arbitration. On April 20, 2010, Markun Zusman filed an answer to the Cordaros' statement of claim. The answer responded to all of the Cordaros' claims against Mr. Templeton, including those arising out of the investments he sold while at USA.

In August 2010, Mr. Templeton left CapWest.

Around that time, CapWest became dissatisfied with the amount of Markun Zusman's legal bills, which it was paying under its self-insured retention, and stopped paying its invoices. On September 28, 2010, Mr. Fehn submitted a "global settlement" proposal to counsel representing four FINRA claimants with arbitrations pending against CapWest, including the Cordaros, attempting to settle the claims for "approximately 3.6% of the claimed amount[s]."[3] *Id.* at 931. The letter said that if all claimants did not agree to the settlement, CapWest would defend the cases on a "first come, first served basis, and then once its coverage and funds are exhausted, it will cease business activity." *Id.* The letter referred only to CapWest and not to CapWest's registered representatives. The claimants did not accept the settlement.

On November 5, 2010, Markun Zusman sent a letter to FINRA withdrawing as

---

[3] At the time of the Cordaro arbitration, CapWest had a number of other FINRA arbitrations pending against it, which were subject to the same Catlin Policy.

counsel for CapWest and Mr. Templeton. Markun Zusman advised FINRA that Mr. Fehn was CapWest's general counsel and provided his contact information. Although Markun Zusman did not send a copy of the letter to Mr. Templeton, on November 12, 2010, a lawyer with Markun Zusman notified Mr. Templeton the firm was no longer representing him in the Cordaro arbitration. On December 13, 2010, Mr. Templeton sent FINRA an email updating his contact information to a mail forwarding service in South Dakota.[4] In February 2011, FINRA apparently requested Mr. Templeton's contact information from Markun Zusman so that it could remove Markun Zusman as Mr. Templeton's attorney of record. Markun Zusman provided an outdated address, a P.O. Box in Santa Fe, New Mexico. FINRA thereafter recognized Mr. Templeton as appearing pro se.

In February 2011, Mr. Templeton emailed Mr. Hall and Ed Price, CapWest's Chief Operating Officer, to ask about the status of the Cordaro arbitration. Mr. Templeton asked if Mr. Fehn was representing CapWest and him in the matter, inquired about the status of settlement negotiations, and said he would need to adjust his travel plans if he needed to be in Albuquerque at the end of March for the arbitration. Mr. Hall responded, stating that "[a]t this moment [Mr. Fehn] is [representing Mr. Templeton]," and that CapWest was working "with Catlin to make that permanent." *Id.* at 935. Mr.

_____

[4] The letter explained he is a legal resident of South Dakota but travels full time and does not have a residential address where he receives mail. It also provided his email address, noting that email was the best way to contact him because he only receives mail forwarding one or two times a month.

Hall also stated that Mr. Fehn was working on a settlement with the Cordaros.

6. **Catlin and CapWest's Disagreement over Replacement Counsel**

On March 1, 2011, Mr. Hall emailed Mr. Rogers requesting authorization of $10,000 to $15,000 to settle the Cordaro matter. Mr. Fehn was copied on the email. Mr. Rogers responded later that day, explaining that he would need time to review the matter before responding to the settlement request. He further stated that handling the matter was "being hampered by the state of defense counsel arrangements." *Id.* at 940.

Mr. Rogers attached a letter to his email explaining Catlin's position on retaining defense counsel. In the letter, he summarized that CapWest rejected the law firm Catlin proposed to represent it and Mr. Templeton and instead insisted FF&S handle the matter. Mr. Rogers objected to retaining FF&S. He explained,

> Catlin does not agree that FF&S would be appropriate for the defense, for the reasons stated at the inception of these matters, with reference to the firm's specialty in the representation of claimants and related issues. Moreover, that firm has served as the general counsel for CapWest during these proceedings. As such, it would not be appropriate for FF&S to also serve as independent defense counsel due to potential conflicts of interest.

*Id.* at 945. In addition, Mr. Rogers agreed to pay FF&S a separate $15,000 for services it had rendered in connection with the global settlement offer after Catlin received an itemized invoice.

On March 7, 2011, Mr. Rogers emailed Mr. Hall, copying Mr. Fehn, approving the $15,000 settlement authority Mr. Hall had requested. Mr. Rogers further stated that the approaching Cordaro arbitration "underscores the need for an agreed-to defense counsel

-13-

approach to be put in place immediately." *Id.* at 939. The next day, Mr. Hall replied to Mr. Rogers, objecting to his refusal to allow FF&S handle the Cordaro matter. Mr. Rogers and Mr. Hall continued discussing their dispute over defense counsel. On March 9, 2011, Mr. Rogers explained that CapWest wanted "Mr. Fehn, but Catlin does not agree to him, and that they would "have to continue discussions to bridge the divide." *Id.* at 949.

On March 11, 2011, Mr. Hall responded, agreeing that they would have to continue discussions. He also provided Catlin with invoices for FF&S's services. Mr. Rogers responded, acquiescing to Mr. Hall's request to pay FF&S the agreed-upon $15,000, but renewing Catlin's objection to FF&S providing defense services going forward.

On March 13, 2011, at Mr. Hall's request, Mr. Templeton sent Mr. Hall updated financial information to pass along to Mr. Fehn. On March 17, 2011, Mr. Templeton sent Mr. Hall another email asking if there was "anything new" in the Cordaro matter and if Mr. Hall had received his financial information. *Id.* at 966. Mr. Hall responded that day, stating: "Got the statement. Tom Fehn was to talk to the [Cordaros'] lawyer this week. [W]ill let you know." *Id.* Mr. Templeton did not communicate with anyone at Catlin or FF&S about the Cordaro matter.

On March 21, 2011, Mr. Hall emailed a legal assistant at FF&S requesting an update on the Cordaro matter. The legal assistant responded on March 23, 2011, stating: "[Mr. Fehn] asked me to remind you that we don't represent Daryl Templeton. [Mr.

Fehn] is out this week, but the update is that we are trying to settle the case." *Id.* at 973.

Mr. Hall replied later that day: "We should be representing Daryl. I mentioned that to Tom. If we alienate Daryl our goose could be cooked." *Id.* at 972-73. The legal assistant responded, "I will let [Mr. Fehn] know asap." *Id.* at 972.

7. **FF&S Negotiates with the Cordaros to Settle their Claim and Dismiss CapWest**

On March 25, 2011, Ms. Davidi, an associate at FF&S, reached an oral agreement with the Cordaros' representatives, Richard Sacks and Irwin Stein, to settle their claim for $13,500. The Cordaros accepted the offer. But when Ms. Davidi contacted Mr. Sacks to confirm that the settlement was with all the parties, Mr. Sacks stated the settlement was with CapWest only and did not include Mr. Templeton. Ms. Davidi then notified FINRA of the settlement, stating that the Cordaros had "reached a settlement with Respondent CapWest Securities, Inc. **only.**" *Id.* at 987.

That same day, the Cordaros notified FINRA that they were dismissing their claims against CapWest with prejudice. Mr. Stein sent Mr. Templeton notice of the settlement to the address FINRA had on file, which was apparently the outdated New Mexico address provided by Markun Zusman.

8. **Mr. Hall Notifies Mr. Templeton and Catlin that the Cordaro Matter Had Settled**

On March 25, 2011, Mr. Hall told Mr. Templeton that the Cordaro matter had settled. On March 28, 2011, Mr. Hall also notified Mr. Rogers that FF&S had settled the Cordaro matter for $13,500. Neither Mr. Templeton nor Mr. Rogers were informed that

-15-

the matter had been settled with CapWest only.

9. **Mr. Templeton Does Not Attend the Cordaro Arbitration**

Unbeknownst to Mr. Templeton and Catlin, the FINRA arbitration proceeded on March 29, 2011, in Mr. Templeton's absence. USA, the only other remaining respondent, also did not appear.[5] At the hearing, the FINRA panel heard uncontested testimony from Mr. Cordaro and argument from Mr. Stein. At the end of the hearing, the panel asked Mr. Stein for an accounting of damages. Mr. Stein stated: "I show 100,000 in DBSI, 150 in Triple Net; . . . 265 in Medical Capital, which I added to 515." *Id.* at 1186. He then acknowledged the $515,000 should be reduced by the $13,500 settlement reached with CapWest.

10. **The Cordaros Refuse to Finalize their Settlement with CapWest Because FF&S Attempts to Include Mr. Templeton in the Settlement Agreement**

On April 4, 2011, Ms. Davidi sent a draft settlement to the Cordaros that included CapWest and Mr. Templeton as released parties. The proposed settlement agreement sought to release CapWest and Mr. Templeton from liability for the $100,000 MedCap IV investment. The Cordaros refused to sign the agreement, explaining they never agreed to the release of Mr. Templeton.

11. **The FINRA Arbitration Panel Issues an Award against Mr. Templeton**

On April 12, 2011, the FINRA panel issued a written decision in favor of the

---

[5] The USA principals had been dismissed before the hearing.

Cordaros. The panel awarded them $500,000 in damages plus costs and interest, and held Mr. Templeton and USA jointly and severally liable for the award. The panel declined to impose punitive damages. It did not make findings of fact and therefore did not separate the investments the Cordaros made through Mr. Templeton when he was at USA from the investment he made while at CapWest. A copy of the award was sent to Mr. Templeton at the Santa Fe, New Mexico address.

12. **Mr. Templeton, Mr. Hall, and Mr. Rogers Learn of the FINRA Award**

On April 15, 2011, Mr. Templeton asked Mr. Hall for an update on the Cordaro settlement. Mr. Hall then contacted Ms. Davidi to ask if she knew anything about the "Cordaro settlement paperwork." *Id.* at 1008. Ms. Davidi responded,

> The latest update is that Plaintiff's attorney is upset that Daryl Templeton is included in the settlement at all. We told him that Mr. Templeton must be included as he is an insured under the policy (with respect to the investment MedCap IV at CapWest Securities, Inc[.]). Plaintiff's attorney said he would take that news back to his client. We have not heard from them yet, but the case has already been taken off [sic] calendar at FINRA.

*Id*.

On April 25, 2011, Mr. Hall learned of the FINRA panel's decision. Mr. Hall emailed it to Mr. Fehn and asked: "Did FINRA misread something? I thought [the Cordaro matter] was adjourned with a settlement." *Id.* at 1010. Mr. Fehn replied that the settlement pertained to CapWest and Mr. Templeton only as to the MedCap IV note, and that the matter "went forward as to the rest" of the Cordaros' claims against Mr. Templeton. *Id.*

-17-

In late April, Mr. Templeton received notice of the FINRA arbitration award.[6] On April 28, 2011, he emailed Mr. Hall the following:

Let me make sure I understand this situation. Please let me know if I have it straight.

Tom Fehn or his firm obtained a settlement with Cordaro regarding the CapWest Arb[itration], on behalf of our E&O Insurance. Did this settlement include me, if not why not? It was my understanding from you that [Mr. Fehn] was representing CapWest and Me in this Arb[itration]. If so, will I receive some type of settlement agreement?

The arbitration went ahead with regard to the United Securities [arbitration] with an award made to Cordaro. This amounted to a default award on my part because USA and I did not show up.

I now need to hire an attorney to represent me in an appeal to FINRA explaining my side of the case.

*Id.* at 1013. Mr. Hall replied,

I would say you have it straight. The way Tom Fehn has explained it to me is that the portion that was a sale with CapWest is settled with you included in that and we should have settlement paperwork for that shortly. . . . The sales that occurred at USA was [sic] not. I was unaware that this case involved two sets of sales in the claim with two different [broker-dealers].

*Id.* at 1012.

On May 4, 2011, Mr. Templeton emailed an attorney at Markun Zusman seeking advice on how to appeal or vacate the FINRA award. On May 9, another Markun Zusman attorney forwarded the email to Mr. Rogers and Joe Mooney, Catlin's claims director. He notified Catlin that he had spoken to the Cordaros' counsel and had

_____

[6] His mail forwarding service sent the award notice from his Santa Fe address to his South Dakota address.

-18-

requested that they "hold off on collection efforts until [they] all collectively figure out, what if anything can be done." *Id.* at 1261. Markun Zusman eventually told Mr. Templeton they would not be able to represent him.

The day after receiving Markun Zusman's email, Mr. Rogers emailed Mr. Hall stating that he had learned about the FINRA award against Mr. Templeton and asking Mr. Hall for a copy of the settlement agreement. Mr. Hall responded the next day, as follows:

> You may be assuming, as I did, that the Cordaro v. CapWest, et al., as you have titled it, was a case involving only CapWest and Daryl Templeton. The case was actually titled "Cordaro v. United Securities Alliance Inc. [et al.]" Tom Fehn offered and had the agreement, with your authority to settle for up to $15K, to settle the case for CapWest and Daryl Templeton for $13.5K for the amount that included CapWest. As I am sure you would agree, he had no authority to settle for anyone else.
>
> I told Daryl that we had settled the case, meaning CapWest's part of the case, not realizing there were other respondents involved. I did not instruct him not to attend but would understand how he may have interpreted it. . . .
>
> The claimants [sic] representative was upset that we had included Daryl Templeton in the settlement for the CapWest portion. This is indeed an unfortunate turn of events, however it was nothing more than a misunderstanding on both my part and Daryl's.

Catlin Supp. App. at 744. Mr. Rogers responded to Mr. Hall's email, asking him to provide documentation that the Cordaro settlement included Mr. Templeton.

On May 20, 2011, FINRA sent Mr. Templeton a notice at his South Dakota address that he had until June 10 to satisfy the Cordaro award or his license to sell securities would be suspended. On May 27, 2011, the Cordaros filed a complaint against

-19-

Mr. Templeton in New Mexico state court to confirm and enforce the arbitration award. Mr. Templeton retained counsel to represent him in the New Mexico action. His counsel never moved to vacate, modify, or set aside the FINRA award in state court.

13. **Mr. Templeton Retains Counsel and Attempts to Negotiate with CapWest and Catlin**

Mr. Templeton then retained another attorney, Ben White, to assist him in dealing with CapWest and Catlin. On June 14, 2011, Mr. White emailed Mr. Rogers, Mr. Hall, and Ms. Davidi alerting them that the Cordaros were willing to settle their claims against Mr. Templeton for $485,000. Mr. White asked that Catlin, CapWest, and FF&S "put together a counter-proposal to take back to the Cordaros' attorney, and to take any and all necessary steps to resolve this matter," failing which Mr. Templeton would initiate litigation against them. App. at 1281.

Mr. Rogers then emailed Mr. Fehn to ask for assurances that the claim against Mr. Templeton had been settled. On June 20, 2011, Mr. Fehn responded that the Cordaros "falsely told the arbitration panel that the case had been settled as to [CapWest] but not as to Templeton for his trades while at [CapWest]." *Id.* at 1014. After Mr. Rogers asked if he had any documentation of that, Mr. Fehn responded: "I sent a draft agreement a few days after the settlement was reached. [I]t included [Mr. Templeton]. I knew he had to be part of the deal." *Id.*

On June 20, 2011, Mr. Rogers also responded to Mr. White, copying Mr. Fehn and Mr. Hall, stating:

[A]s we discussed, Catlin did provide the Insureds, including Mr. Templeton and CapWest, with a defense in this arbitration, subject to full reservations of rights. The Insureds, however, raised objections to fee statements for the firm that they originally agreed to undertake the defense, and while these fees were still subject to a self-insured retention under the Catlin policy. That resulted in the original firm withdrawing from the Insureds' representation, which was to be taken over by the other firm that CapWest had requested. Catlin's understanding was that the new firm would represent both Insureds. Moreover, as per CapWest's request, settlement was also agreed to by Catlin as to both Insureds. It appears from your statements below that something may have gone wrong with implementing the defense and settlement of the Insureds, in accordance with the understandings of Catlin and CapWest. Nevertheless, Catlin is still amenable to resolution of this matter, if possible, in a manner consistent with the terms of the policy, and with any other culpable parties participating in same.

Catlin Supp. App. at 751. On June 28, 2011, Mr. Hall proposed that Mr. White approach FINRA and request that the arbitration award be set aside. Mr. White rejected the proposal, stating that "[t]here is absolutely zero chance that FINRA would 'set aside' the award." App. at 1198.

In the months that followed, Catlin continued to communicate with Mr. White in an attempt to settle the Cordaro award against Mr. Templeton. On August 5, 2011, Mr. White communicated a $450,000 offer from the Cordaros. On September 14, 2011, Mr. Rogers proposed to Mr. Hall offering $50,000 of the Policy limit toward the settlement of the Cordaros' award against Mr. Templeton. Mr. Hall, however, objected to the remaining funds under the Policy being used to settle the Cordaros' award against Mr. Templeton.

-21-

14. **Mr. Templeton Settles with the Cordaros**

On April 26, 2012, the New Mexico state court confirmed the arbitration award against Mr. Templeton for $500,000 plus interest and arbitration fees. On September 25, 2012, Mr. Templeton settled the New Mexico judgment with the Cordaros for $555,000.

B. *Procedural History*

On April 3, 2012, Mr. Templeton filed this action in the U.S. District Court for the District of Colorado against Mr. Hall, Catlin, and the attorney-defendants. Mr. Templeton claimed negligent misrepresentation against Mr. Hall; indemnification and breach of duty to defend against Catlin; and legal malpractice, breach of fiduciary duties, and negligent misrepresentation against the attorney-defendants. The attorney-defendants answered the complaint. Catlin answered and counterclaimed for a judgment declaring it owed no duty to indemnify Mr. Templeton against the arbitration award.

On June 11, 2012, Mr. Hall moved to dismiss. In response, Mr. Templeton filed an amended complaint and an opposition to Mr. Hall's motion. The district court granted Mr. Hall's motion to dismiss, concluding that Mr. Templeton failed to allege sufficient facts to state a claim for negligent misrepresentation against Mr. Hall.

After discovery, Mr. Templeton and Catlin cross-moved for summary judgment on Mr. Templeton's indemnification and breach of duty to defend claims. Catlin further moved for summary judgment on its counterclaim for a declaration that it did not owe Mr. Templeton a duty to defend. The district court entered judgment on all three claims in Catlin's favor.

Mr. Templeton also moved for partial summary judgment on his legal malpractice claim against the attorney-defendants, arguing there was an attorney-client relationship between FF&S and Mr. Templeton. The court denied Mr. Templeton's motion in an oral ruling. The attorney-defendants then moved for summary judgment on all of Mr. Templeton's claims against them. Mr. Templeton filed a cross-motion for reconsideration of his earlier motion for partial summary judgment. The court granted the attorney-defendants' motion in its entirety and denied Mr. Templeton's request for reconsideration, concluding that Mr. Templeton's legal malpractice and breach of fiduciary duty claims failed because there was no attorney-client relationship between the attorney-defendants and Mr. Templeton, nor did the attorney-defendants owe Mr. Templeton a duty of care in the absence of an attorney-client relationship.[7]

## II. **DISCUSSION**

On appeal, Mr. Templeton argues the district court erred when it: (A) dismissed his negligent misrepresentation claim against Mr. Hall, (B) granted summary judgment to Catlin on his indemnification claim and Catlin's counterclaim, (C) granted summary judgment to Catlin on his breach of the duty to defend claim, and (D) granted summary judgment to the attorney-defendants on his legal malpractice and breach of fiduciary duty

---

[7] The court also granted summary judgment to the attorney-defendants on Mr. Templeton's negligent misrepresentation claim. Mr. Templeton does not challenge the dismissal of this claim on appeal.

claims.  We affirm on all issues except the duty to defend issue, on which we affirm in part and reverse and remand in part.

## A. *District Court's Dismissal of Mr. Hall*

Mr. Templeton argues the district court erred in dismissing his negligent misrepresentation claim against Mr. Hall.  We conclude the district court properly dismissed this claim because it failed to allege Mr. Hall's statements were made for Mr. Templeton's guidance in a business transaction.  Accordingly, we affirm.[8]

### 1. **Standard of Review and Legal Background**

#### a. *Standard of review*

We review a district court's dismissal of a claim under Rule 12(b)(6) de novo, *Thomas v. Kaven*, 765 F.3d 1183, 1190 (10th Cir. 2014), applying the same legal standard as the district court, *Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007). We accept all well-pled allegations as true and construe them in the light most favorable to the non-moving party.  *Thomas*, 765 F.3d at 1190.  "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

#### b. *Legal background on negligent misrepresentation*

To state a claim for negligent misrepresentation under Colorado law, a plaintiff must allege:  (1) the defendant, in the course of his or her business, profession or

---

[8] Because this issue was decided based on a motion to dismiss, we must review this issue based solely on the allegations made in Mr. Templeton's amended complaint.

employment; (2) made a misrepresentation of material fact, without exercising reasonable care; (3) for the guidance of others in a business transaction; (4) with knowledge that the plaintiff would rely on his or her representation; and (5) the plaintiff justifiably relied on the misrepresentation to his or her detriment. *Allen v. Steele*, 252 P.3d 476, 482 (Colo. 2011).

"[T]he requirement that the misrepresentation was made 'for the guidance of others in their business transactions' is an essential element of the tort of negligent misrepresentation." *Id.* at 483. The Colorado Supreme Court has defined "business transaction" for purposes of a negligent misrepresentation claim to mean a business or commercial transaction. *Id.* at 483-84. Therefore, "to state a claim of negligent misrepresentation, the misrepresentation must be given for the plaintiff's *business or commercial purposes*." *Id.* at 484 (emphasis added).

In *Allen*, an attorney provided the plaintiffs incorrect information regarding the statute of limitations for a personal injury claim during an initial consultation, which caused them to miss a filing deadline. *Id.* at 479. The court held that the plaintiffs failed to state a claim for negligent misrepresentation because "an initial consultation to discuss a potential civil lawsuit is not sufficient" to meet the "guidance of others in their business transactions" requirement. *Id.* at 484. The court explained that "[a]lthough a negligence lawsuit against another party has the potential to affect indirectly a non-client's financial or economic interests, a civil lawsuit does not involve a business or commercial relationship or transaction." *Id.*

2. **Analysis**

In his amended complaint, Mr. Templeton alleged that Mr. Hall negligently misrepresented that FF&S was representing Mr. Templeton in the Cordaro arbitration, the matter had settled, and Mr. Templeton did not need to attend the arbitration hearing. Mr. Hall made these statements concerning the Cordaros' FINRA arbitration. Although Mr. Templeton appears to have made sufficient factual allegations to state a claim under four of the five elements of negligent misrepresentation, we do not see how the FINRA arbitration here is distinct from the civil lawsuit in *Allen* for purposes of the "business transaction" element of the claim.

Mr. Templeton argues that the FINRA arbitration qualifies as a business transaction because Mr. Templeton's financial and professional interests were affected the outcome of the proceeding. In *Allen*, the court acknowledged that a civil lawsuit could affect the parties' financial interests but concluded that the nature of the proceeding fell outside the definition of a "business transaction." *Id*. The same analysis applies here.

We conclude Mr. Hall's statements to Mr. Templeton about the Cordaro arbitration were insufficient to meet the "guidance of others in their business transactions" requirement of a negligent misrepresentation claim.[9] Accordingly, we

---

[9] In his Reply Brief, Mr. Templeton argues for the first time that Mr. Hall assumed an agency role regarding the Cordaros' claim and Mr. Hall was negligent in fulfilling his agency responsibilities to Mr. Templeton. We decline to address this argument because Mr. Templeton did not raise it until his reply brief. *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000) ("This court does not ordinarily review issues raised for the first time in

Continued . . .

affirm the district court's dismissal of Mr. Hall.[10]

## B. *Catlin's Duty to Indemnify*[11]

a reply brief."). This argument is otherwise forfeited because Mr. Templeton did not present it to the district court and does not argue plain error on appeal. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127-28 (10th Cir. 2011).

[10] Mr. Hall requests costs and attorney fees for successfully defending this appeal under C.R.S. §§ 13-16-113 and 13-17-201. *See* Hall Br. at 28-29. We leave the determination of costs and attorney fees to the district court on remand.

[11] Catlin argues we lack jurisdiction to review the court's grant of summary judgment on its counterclaim because Mr. Templeton's July 3, 2014 notice of appeal concerned only the district court's June 24, 2014 order entering judgment for Catlin on Mr. Templeton's claims against it, and not the district court's August 1, 2014 order, which entered judgment for Catlin on its counterclaim. Catlin further argues that Mr. Templeton's appeal of the district court's grant of summary judgment to Catlin on his indemnification claim is therefore moot because reversing would have no effect on the counterclaim, which granted Catlin a declaration that it owed no duty to indemnify Mr. Templeton. We reject both arguments.

Even though Mr. Templeton's July 3, 2014 notice of appeal was inadequate to appeal the court's judgment with respect to Catlin's counterclaim, Mr. Templeton's August 28, 2014 "Status Report re Rule 54(b) Certification and Supplement to His Notice of Appeal and Docketing Statement" qualifies as a "functional equivalent" of a notice of appeal. *See Smith v. Barry*, 502 U.S. 244, 248-49 (1992) ("If a document filed within the time specified by Rule 4 gives the notice required by Rule 3, it is effective as a notice of appeal."). Mr. Templeton's Status Report was filed within 30 days of the district court's judgment on Catlin's counterclaim, *see* Fed. R. App. P. 4(a)(1)(A) (providing a 30-day time period after the entry of judgment for filing a notice of appeal), and provides the notice required by Federal Rule of Appellate Procedure 3(c)(1), including specifying the district court's judgment on Catlin's counterclaim as an issue on appeal. *See* Fed. R. App. P. 3(c)(1) (stating that a notice of appeal must "specify the party or parties taking the appeal . . . ; designate the judgment, order, or part thereof being appealed; and . . . name the court to which the appeal is taken"). We therefore have jurisdiction to review Mr. Templeton's appeal of the counterclaim summary judgment, and his appeal of his indemnity claim is not moot.

Mr. Templeton argues the district court erred in granting summary judgment to Catlin on his indemnification claim and Catlin's counterclaim for declaratory relief. The district court concluded coverage was excluded under Exclusion D.1.b and that Catlin should not be equitably estopped from relying on the exclusion.[12] We affirm because Mr. Templeton is not entitled to indemnification based on Exclusion D.1.b of the Policy and the district court did not abuse its discretion in denying Mr. Templeton's request for equitable estoppel.[13]

## 1. **Standard of Review and Summary Judgment Law**

We review a grant of summary judgment de novo, "using the same standard applied by the district court pursuant to Fed. R. Civ. P. 56(a)." *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Moreover, we must not "weigh the evidence and determine the truth of the matter," but instead must merely determine "whether there is a genuine issue for trial." *Id.* at 249. Summary judgment shall be granted if "there is no genuine dispute as to any material fact" and the moving party is

---

[12] The court also rejected Mr. Templeton's argument that Catlin waived its right to invoke Exclusion D.1.b. Mr. Templeton does not contest this ruling on appeal.

[13] The district court also concluded Catlin had no duty to indemnify Mr. Templeton based on Exclusion N, the "insolvency/receivership" exclusion. Because we conclude Exclusion D.1.b bars coverage, we decline to reach whether Exclusion N also supports summary judgment.

"entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The moving party must first demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[A] movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Instead, the moving party may "simply . . . point[] out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* If the movant meets its initial burden, "the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* (quotations omitted).

2. **Analysis**[14]

    a. *Exclusion D.1.b*

        i. <u>Interpreting insurance contracts under New York law</u>

The district court concluded Exclusion D.1.b barred coverage for Mr. Templeton's claim because the MedCap II transactions and MedCap IV transaction were interrelated wrongful acts under the Policy. We agree. Exclusion D.1.b states, in relevant part:

> This policy shall not apply to and the Insurer shall pay neither Damages nor Defense Expenses for any Claim . . . arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way

---

[14] The parties dispute whether Catlin should be able to rely on Mr. Cordaro's testimony before the FINRA arbitration panel to support its position. Because we conclude Exclusion D.1.b applies without considering this evidence, we do not reach this issue.

involving . . . any Wrongful Act occurring on or after the Retroactive Date which, together with a Wrongful Act occurring on or prior to such Retroactive Date, would constitute Interrelated Wrongful Acts. . . .

App. at 882 (Policy § III.D.1.b). The Policy defines wrongful acts as "Interrelated Wrongful Acts" if they are "similar, repeated or continuous," or "connected by reason of any common fact, circumstance, situation, transaction, casualty, event, decision or policy or one or more series of facts, circumstances, situations, transactions, casualties, events, decisions or policies." *Id.* at 880 (Policy § II.M).

The Catlin Policy contains a choice-of-law provision stating that New York law governs claims brought under the Policy. *Id.* at 894 (Policy § XIII). New York law therefore applies to Mr. Templeton's indemnification claim. Under New York law, interpretation of an insurance contract is a question of law. *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (S.D.N.Y. 2002). Summary judgment is appropriate when the words of a contract convey a definite and precise meaning without any ambiguity. *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). An insurer bears the burden of proving that a claim falls within the scope of a policy exclusion. *Vill. of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995). The insurer meets this burden by establishing "that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Id.* at 115-16 (quotations omitted).

ii. Exclusion D.1.b is not ambiguous

Mr. Templeton appears to argue the exclusion is ambiguous. He contends that

affording the ordinary meaning to the term "similar" is too broad and would be contrary to the reasonable expectations of the average insured. We discern no ambiguity in this provision because the exclusion's language is "complete, clear, and unambiguous." *Greenfield v. Phillies Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002).

Mr. Templeton correctly identifies that the focus of our inquiry is "on the reasonable expectations of the average insured upon reading the policy and employing common speech." *Mostow v. State Farm Ins. Cos.*, 668 N.E.2d 392, 394 (N.Y. 1996) (citations omitted). His reliance on such reasonable expectations, however, is unpersuasive because the terms of the exclusion are subject to only one meaning. Mr. Templeton himself acknowledges the term "similar" is "extremely broad in everyday usage." Aplt. Br. at 52; *see Fed. Ins. Co. v. Int'l Bus. Machs. Corp.*, 965 N.E.2d 934, 936 (N.Y. 2012) (explaining that a policy term will be considered ambiguous only where "there is a 'reasonable basis for a difference of opinion' as to the meaning of the policy" (quoting *Greenfield*, 780 N.E.2d at 170-71)). In other words, the reasonable expectation of the average insured would be to understand the word "similar" in its common usage. Moreover, courts have uniformly concluded that policy provisions similar to this one are unambiguous. *Glascoff v. OneBeacon Midwest Ins. Co.*, No. 13 Civ. 1013(DAB), 2014 WL 1876984, at *5 (S.D.N.Y. May 8, 2014) (unpublished); *Zahler v. Twin City Fire Ins. Co.*, No. 04 Civ. 10299(LAP), 2006 WL 846352, at *5 (S.D.N.Y. Mar. 31, 2006) (unpublished). We therefore apply the exclusion's plain meaning. *See Greenfield*, 780

N.E.2d at 170.[15]

### iii. Exclusion D.1.b excludes coverage under its plain meaning

Under its plain meaning, Exclusion D.1.b excludes coverage for Mr. Templeton's claim. As stated above, the Policy defines "Interrelated Wrongful Acts" as wrongful acts that are "similar, repeated or continuous," or "connected by reason of any common fact, circumstance, situation, transaction, casualty, event, decision or policy or one or more series of facts, circumstances, situations, transactions, casualties, events, decisions or policies." App. at 880 (Policy § II.M). Catlin argues the exclusion bars coverage because the MedCap II and MedCap IV transactions are "similar" or "connected" by common facts and circumstances.

In common usage, "similar" means "having characteristics in common."[16] *Merriam-Webster Online Dictionary*, http://www.merriam-webster.com/dictionary/similar (last visited June 24, 2015); *see also Oxford English Dictionary Online*, http://www.oed.com/view/Entry/179873 (last visited June 24, 2015) (defining similar as "[h]aving a marked resemblance or likeness; of a like nature or

---

[15] Because we conclude the policy language is unambiguous, we reject Mr. Templeton's argument that we should apply the doctrine of *contra proferentem*, which provides that an ambiguity in an insurance contract should be resolved in favor of the insured. *See Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000) (explaining rules of contract construction, such as *contra proferentem*, are only applicable where the contract language is ambiguous).

[16] New York courts commonly refer to dictionary definitions to ascertain the common and ordinary meaning of the words of an insurance policy. *See 2619 Realty, LLC v. Fid. & Guar. Ins. Co.*, 756 N.Y.S.2d 564, 566 (App. Div. 2003).

kind"). "Connected" is defined as "joined or linked together." *Merriam-Webster Online Dictionary*, http://www.merriam-webster.com/dictionary/connected (last visited June 24, 2015); *see also Oxford English Dictionary Online*, http://www.oed.com/view/Entry/39329 (last visited June 24, 2015) (defining "connected" as "[r]elated, associated (in nature or idea)." These definitions are consistent with applying a "sufficient factual nexus" test, which this and other courts have used in considering similar interrelated wrongful acts provisions under New York law. *See Brecek & Young Advisors, Inc. v. Lloyds of London Syndicate 2003*, 715 F.3d 1231, 1238 & n.3 (10th Cir. 2013).[17]

In *Brecek*, we considered an identical interrelated wrongful acts provision under New York law and found claims asserted in three separate arbitration proceedings were interrelated wrongful acts. *Id.* at 1238-39. Our conclusion was based on the fact "[s]everal common facts" connected the arbitrations, including that the arbitrations had overlapping (although not identical) respondents, all the misconduct was alleged to have occurred during the same time frame—from the late 1990s to the mid-2000s, and all the

---

[17] *See also Glascoff*, 2014 WL 1876984, at *5 ("To demonstrate a sufficient factual nexus, the claims need not involve precisely the same parties, legal theories, Wrongful Acts, or requests for relief." (quotations omitted)); *Quanta Lines Ins. Co. v. Investors Capital Corp.*, No. 06 Civ. 4624(PKL), 2009 WL 4884096, at *14 (S.D.N.Y. Dec. 17, 2009) (unpublished) (explaining that "[a] sufficient factual nexus exists where the Claims are neither factually nor legally distinct, but instead arise from common facts and where the logically connected facts and circumstances demonstrate a factual nexus among the Claims" (quotations omitted)); *Seneca Ins. Co. v. Kemper Ins. Co.*, No. 02 Civ. 10088(PKL), 2004 WL 1145830, at *9 (S.D.N.Y. May 21, 2004), *aff'd*, 133 F. App'x 770 (2d Cir. 2005) (unpublished).

claims had similar allegations and were premised on similar legal theories of liability.  *Id.* at 1238.  Specifically, we noted that all of the claims had similar allegations that the respondents sold unsuitable investment products involving various annuities, all the claims included allegations of "churning and flipping," and Brecek's liability in all the actions was predicated on the same theories—vicarious liability and failure to supervise. *Id.*

We conclude the MedCap II transactions and the MedCap IV transaction constitute "Interrelated Wrongful Acts" under the Policy.  First, the Policy's definition of "Interrelated Wrongful Acts" is broad, requiring only that the wrongful acts be "similar" or "connected by reason of *any* common fact, circumstance, situation, transaction, casualty, event, decision or policy."  App. at 880 (Policy § II.M) (emphasis added).  Second, common facts connect the MedCap II and MedCap IV transactions.  They were sales to the same clients—the Cordaros, investments in subsidiaries of the same company, and sales by the same securities broker—Mr. Templeton.  Even if the Cordaros did not merely "roll over" the proceeds from their MedCap II investment into MedCapIV, they reinvested the entire return on their MedCapII investment into MedCap IV.  Third, the Cordaros' claims regarding the MedCap II and MedCap IV transactions alleged liability based on the same conduct by Mr. Templeton—his failure to disclose the same material facts about MedCap Holdings, his failure to investigate the products he sold, and his failure to conduct a proper suitability analysis of the Cordaros before selling them the MedCap II and MedCap IV notes.  The MedCap II and MedCap IV transactions are

-34-

"similar" and "connected by reason of any common fact [or] circumstance." They therefore meet the Policy definition of "Interrelated Wrongful Acts."

Mr. Templeton's attempt to distinguish the MedCap II and MedCap IV transactions is not persuasive. He posits the MedCap II transactions occurred when he was a USA registered representative, whereas the MedCap IV transaction occurred when he was with CapWest. He further argues the Cordaros did not merely "roll over" the funds they received when the MedCap II notes matured to purchase the MedCap IV note, but they instead paid separately for the MedCap IV note, so he and CapWest did not maintain control of the funds. He also contends the Cordaros filled out new account forms with CapWest, including new suitability and risk tolerance forms.[18] These dissimilarities, however, do not show the wrongful acts were not "similar" or "connected."

Because the MedCap II and MedCap IV transactions qualify as "Interrelated Wrongful Acts," and the MedCap II transactions occurred before the Retroactive Date of the Catlin Policy, Mr. Templeton's indemnification claim is barred by Exclusion D.1.b.[19]

---

[18] The Cordaros filled out new account forms, which included a customer suitability and risk tolerance section, when Mr. Templeton transferred their account to CapWest in 2005. There is no indication they filled out additional risk tolerance or suitability forms prior to their purchase of the MedCap IV note in 2007.

[19] Mr. Templeton's argues we should reverse based on the deposition testimony of Mr. Mooney, Catlin's claims director and designated corporate representative, under Federal Rule of Civil Procedure 30(b)(6). Mr. Mooney testified Mr. Templeton was owed indemnity for the Cordaros' claims regarding MedCap IV. This court has not

Continued . . .

b. *Equitable estoppel*

Mr. Templeton argues that even if Exclusion D.1.b otherwise bars coverage under the Policy, we should nonetheless apply equitable estoppel to prevent Catlin from relying on it because Catlin did not invoke Exclusion D.1.b in its reservation of rights letter.

Under New York law, "[w]here an insurer defends an action on behalf of an insured, with knowledge of a defense to the coverage of the policy, it thereafter is estopped from asserting that the policy does not cover the claim." *Hartford Ins. Grp. v. Mello*, 437 N.Y.S.2d 433, 434 (App. Div. 1981); *see also Albert J. Schiff Assocs., Inc. v. Flack*, 417 N.E.2d 84, 87 (N.Y. 1980) ("[T]he intervention of principles of equitable estoppel [is appropriate] . . . where an insurer, though in fact not obligated to provide coverage, without asserting policy defenses or reserving the privilege to do so, undertakes the defense in the case, in reliance on which the insured suffers the detriment of losing the right to control its own defense."). Estoppel applies only if the insurer's actions have prejudiced the insured. *Hartford*, 437 N.Y.S.2d at 434. Prejudice "is established only

addressed whether the testimony of a Rule 30(b)(6) representative qualifies as a judicial or evidentiary admission. The majority of courts to reach the issue, however, treat the testimony of a Rule 30(b)(6) representative as merely an evidentiary admission, and do not give the testimony conclusive effect. *See, e.g.*, *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001); 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice & Procedure § 2103 (3d ed. 2010) ("Testimony given at a deposition of a designated corporate representative is not a judicial admission that ultimately decides the case."); *but see Rainey v. Am. Forest & Paper Ass'n, Inc.*, 26 F. Supp. 2d 82, 96 (D.D.C. 1998) (refusing to consider an affidavit that contradicted a Rule 30(b)(6) deposition). We do not need to decide this issue because coverage is a question of law. Regardless of whether Mr. Mooney's testimony qualifies as a judicial or evidentiary admission, his testimony does not create a triable issue of fact.

where the insurer's control of the defense is such that the character and strategy of the lawsuit can no longer be altered." *Brecek*, 715 F.3d at 1242 (quotations omitted).

The district court denied Mr. Templeton's equitable estoppel claim because the reservation of rights letter specifically referenced Exclusion D and contained a broad reservation of Catlin's rights to deny coverage at any time. We review the district court's denial of equitable estoppel for abuse of discretion. *Id.* at 1240. "A district court abuses its discretion when its judgment is arbitrary, capricious, whimsical, or manifestly unreasonable." *Id.*

As the district court concluded, Catlin provided Mr. Templeton notice that it was reserving its rights to deny coverage of the Cordaros' claim, and the reservation of rights letter referenced Exclusion D as a possible basis for denying coverage. Although the letter did not specifically mention the "Interrelated Wrongful Acts" exclusion, that exclusion is part of Exclusion D, and Mr. Templeton cites no authority that notice here was inadequate. In fact, an insurer's reservation of rights prevents an insured from later claiming detrimental reliance, "even if the insurer later disclaims [coverage] on a basis different from the ground originally asserted in the reservation of rights." *Federated Dep't Stores, Inc. v. Twin City Fire Ins. Co.*, 807 N.Y.S.2d 62, 67 (App. Div. 2006). The district court did not abuse its discretion in denying Mr. Templeton's request to estop Catlin from relying on Exclusion D.1.b.

\* \* \* \*

-37-

Accordingly, we conclude Exclusion D.1.b bars coverage to Mr. Templeton for the MedCap IV transaction, and Catlin is not equitably estopped from relying on the exclusion. We therefore affirm the district court's grant of summary judgment to Catlin on Mr. Templeton's indemnification claim and Catlin's counterclaim.

## C. *Catlin's Duty to Defend*

The district court granted summary judgment to Catlin on Mr. Templeton's breach of duty to defend claim. It noted the parties' briefing addressed three phases in the underlying proceeding potentially implicating Catlin's duty: "the lead-up to and during the FINRA arbitration, the time when an appeal could have been taken, and during settlement negotiations with the Cordaros." App. at 640. The court concluded Catlin did not breach its duty to defend in any of these phases. Mr. Templeton argues the court erred in granting summary judgment to Catlin and should have granted summary judgment to him. We conclude Catlin breached its duty to defend during the first phase, but did not breach its duty to defend during the second and third phases.

1. **Standard of Review and Summary Judgment Law**

We review the district court's grant of summary judgment de novo and apply the same standard stated in Section II.B.1, *supra*.

2. **Analysis**

Like the indemnification claim, Mr. Templeton's duty to defend claim is based on the Catlin policy, and New York law therefore also applies. Although the district court and now this court have determined that Catlin did not owe Mr. Templeton

-38-

indemnification under the Policy, Catlin nonetheless owed Mr. Templeton a duty to defend him against the Cordaros' claim. "Where an insurance policy includes the insurer's promise to defend the insured against specified claims as well as to indemnify for actual liability, the insurer's duty to furnish a defense is broader than its obligation to indemnify." *Seaboard Sur. Co. v. Gillette Co.*, 476 N.E.2d 272, 274-75 (N.Y. 1984). "[A]n insurer's duty to defend its insured is exceedingly broad and an insurer will be called upon to provide a defense whenever the allegations of the complaint suggest a reasonable possibility of coverage." *BP Air Conditioning Corp. v. One Beacon Ins. Grp.*, 871 N.E.2d 1128, 1131 (N.Y. 2007) (quotations and alterations omitted).

When, as here, an insurer undertakes to provide a defense under a reservation of rights, the insurer's duty to defend continues until a court determines the insured's claim is excluded from coverage under the policy. *Burroughs Wellcome Co. v. Commercial Union Ins. Co.*, 632 F. Supp. 1213, 1220 (S.D.N.Y. 1986). Catlin does not contest it owed Mr. Templeton a duty to defend. It undertook such a duty in the reservation of rights letter and therefore was obligated to provide him a defense under the Policy until a court determined that Mr. Templeton was not entitled to indemnification. Catlin argues only it did not breach that duty.

The Policy provided that Catlin had a "duty to defend any civil litigations or arbitrations against the Insureds that are covered by th[e] Policy." App. at 876 (Policy § I.B) (emphasis omitted). It further provided that Catlin had a duty to "appoint counsel of its selection to defend the Insureds and pay associated Defense Expenses." *Id.*

-39-

"When an insured has been sued, the insurer does not satisfy its duty to defend merely by designating independent counsel to defend the litigation." *Feliberty v. Damon*, 527 N.E.2d 261, 263 (N.Y. 1988). In addition, an insurer's duty to defend includes the hiring of unconflicted counsel and competent counsel. *Cornwell v. Safeco Ins. Co. of Am.*, 346 N.Y.S.2d 59, 69 (App. Div. 1973); *see also Feliberty*, 527 N.E.2d at 263.

    a. *Lead-up to and during the FINRA arbitration*

Mr. Templeton argues Catlin breached its duty to defend in the lead-up to and during the FINRA arbitration. The district court concluded Catlin did not breach its duty during this period because it justifiably believed FF&S had been handling the Cordaro matter on behalf of both CapWest and Mr. Templeton, and that FF&S had settled the matter before the hearing date. Mr. Templeton argues Catlin violated its duty because (1) it never retained replacement counsel for him, as a separate insured under the Policy, after Markun Zusman withdrew, and (2) even if Catlin did retain FF&S to replace Markun Zusman, FF&S could not represent both Mr. Templeton and CapWest because they had a conflict of interest. Catlin contends, because there was a conflict of interest between itself and its insureds, it satisfied its duty to defend under New York law by yielding to CapWest's request to select FF&S as counsel for itself and Mr. Templeton. *See Prashker v. U.S. Guar. Co.*, 136 N.E.2d 871, 876 (N.Y. 1956). We agree with Mr. Templeton and disagree with Catlin.

In *Prashker*, the New York Court of Appeals explained that when the insurer's interests in defending a lawsuit conflict with the insured's interests, the insurer loses the

right to control the defense.  *See id.*; *see also Pub. Serv. Mut. Ins. Co. v. Goldfarb*, 425 N.E.2d 810, 815 (N.Y. 1981).  The insured then has the right to select an attorney of its choosing and the insurer is obligated to pay reasonable defense costs of the insured's selected counsel.  *Prashker*, 136 N.E. 2d at 876; *see also 69th Street & 2nd Ave. Garage Assocs., L.P. v. Ticor Title Guar. Co.*, 622 N.Y.S.2d 13, 14 (App. Div. 1995) ("[T]he law is clear that where a conflict of interest is probable, selection of attorneys to represent the insured should be made by the insured rather than by the insurance company, which should remain liable for reasonable fees."); *Pub. Serv. Mut. Ins. Co.*, 425 N.E.2d at 815.

Catlin argues its interests conflicted with CapWest's and Mr. Templeton's because it was defending the FINRA proceeding subject to a reservation of rights, and its only obligation was to yield to CapWest's choice to select FF&S as defense counsel for itself and Mr. Templeton and to pay reasonable defense costs.[20]  And Catlin contends Mr. Hall had authority to act on Mr. Templeton's behalf under the Policy because the Policy provided that "the Broker/Dealer agrees to act on behalf of all of the Insureds for all purposes."  App. at 893 (Policy § IX.K).  These arguments are unavailing.

First, even if Mr. Hall had such authority, the facts do not show Catlin ever yielded.  When Mr. Hall requested that Catlin allow CapWest to retain FF&S, Mr. Rogers adamantly objected, explaining that Catlin did not believe FF&S would be appropriate

---

[20] Catlin also conceded at oral argument that it never actually paid FF&S for its settlement negotiations with the Cordaros.  Oral Arg. at 1:03:53-1:04:24; *see also* FF&S Supp. App. at 44.

"due to potential conflicts of interest." App. at 945. Although Mr. Rogers authorized via email Mr. Hall's request for $15,000 so that FF&S could attempt to settle the Cordaro matter, that email does not show that Catlin acceded to CapWest's selection of FF&S as defense counsel. In that same email, Mr. Rogers stated that he and Mr. Hall still needed to find an "agreed-to defense counsel." *Id.* at 939. Mr. Hall and Mr. Rogers's communications also show that Catlin relented only in part to pay fees related to FF&S's handling of the global settlement, but even then Catlin continued to object to FF&S's further involvement.

Second, Mr. Hall and Mr. Rogers' communications at most can be read to show Catlin agreed to retain FF&S to represent the insureds only for settlement negotiations with the Cordaros. Nothing indicates Catlin agreed to FF&S's assuming the defense of CapWest and Mr. Templeton for the entire arbitration proceeding. Even if Catlin reasonably believed that FF&S had settled the Cordaro matter when it was notified on March 28, 2011, it still had not retained defense counsel for the arbitration proceeding scheduled to start the next day and therefore did not fulfill its duty to defend Mr. Templeton. No evidence shows that Catlin had counsel in place for CapWest or Mr. Templeton had the arbitration actually proceeded, which it did for Mr. Templeton. If Catlin had fulfilled its obligation to hire counsel to represent Mr. Templeton, Mr. Templeton's counsel would have been aware that the matter had not settled against him, and Mr. Templeton would have been represented in the arbitration.

Third, even if Catlin had yielded to CapWest's authority to select counsel of its

-42-

own choosing, Catlin still failed to appoint nonconflicted counsel for Mr. Templeton, who was separately insured under the Policy. *See Cornwell*, 346 N.Y.S.2d at 69. Catlin believed FF&S could not represent Mr. Templeton and CapWest because of a potential conflict of interest. At oral argument, Catlin's attorney acknowledged that when Markun Zusman served as counsel for both CapWest and Mr. Templeton, the parties waived the conflict of interest. Oral Arg. at 37:06-37:43. Catlin never received a waiver from any of the parties for FF&S's possible joint representation of them. Without such a waiver, Catlin could not satisfy its duty to defend Mr. Templeton.

Catlin did not fulfill its duty to defend Mr. Templeton in the lead-up to and during the FINRA arbitration proceedings and was not entitled to summary judgment as to this period of time.

b. *Post-arbitration period*

Mr. Templeton argues the district court erred in granting summary judgment to Catlin regarding alleged breach of its duty to retain counsel to appeal the arbitration award. The district court rejected this claim because Mr. Templeton could not show there was a reasonable probability that an appeal would have been successful. We affirm.

Although the duty to defend extends through the time appeals have been exhausted, the duty to prosecute an appeal exists only if "there are reasonable grounds for appeal." *See Kaste v. Hartford Accident & Indem. Co.*, 170 N.Y.S.2d 614, 616 (App. Div. 1958) (quotations omitted). Mr. Templeton does not point to any reasonable basis to appeal the arbitration award. He argues only that if the award had been appealed, he may

-43-

have been more favorably positioned to negotiate a settlement with the Cordaros. But the duty to defend does not include bringing a groundless appeal. Catlin therefore did not breach its duty in failing to appeal the arbitration award.

      c. *Post-judgment duty to negotiate a settlement with the Cordaros*

Mr. Templeton attempts to appeal the district court's grant of summary judgment to Catlin regarding alleged breach of its duty to defend in post-judgment settlement negotiations with the Cordaros. The district court concluded Catlin did not breach any post-judgment duty to settle with the Cordaros because Mr. Templeton failed to "discuss this aspect of his duty-to-defend claim in his [opposition to summary judgment], and [did] not offer any evidence showing that the Cordaros would have accepted the remaining limits of the Catlin Policy to settle their claims." App. at 644. Mr. Templeton does not address this aspect of the district court's order in his opening brief. We therefore decline to consider it here. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007).

*   *   *   *

Accordingly, we reverse the district court's grant of summary judgment to Catlin on Mr. Templeton's duty-to-defend claim as it relates to the lead-up to and during the FINRA arbitration proceeding. We otherwise affirm the district court's rulings on this issue.

-44-

D. *District Court's Grant of Summary Judgment to the Attorney-Defendants*

Mr. Templeton argues the district court erred in granting summary judgment to the attorney-defendants on his legal malpractice and breach of fiduciary duties claims because (1) an attorney-client relationship existed between him and the attorney-defendants, or, alternatively (2) the attorney-defendants owed him a duty of care in the absence of an attorney-client relationship. We conclude (1) no attorney-client relationship existed between Mr. Templeton and the attorney-defendants, and (2) the attorney-defendants did not otherwise owe Mr. Templeton, as a non-client, a duty of care. Accordingly, we affirm the district court's grant of summary judgment to the attorney-defendants.

1. **Standard of Review and Summary Judgment Law**

We review the district court's grant of summary judgment de novo and apply the same standard stated in Section II.B.1, *supra*.

2. **Analysis**

The parties agree that California law governs Mr. Templeton's claims against the attorney-defendants.[21] Under California law, an essential element of a claim for legal

---

[21] Under Colorado's "most significant relationship" test, California law applies because Mr. Fehn, Mr. Sherwin, and Ms. Davidi are all California-licensed attorneys and California has the most significant interest in governing the conduct of its licensed attorneys. *See, e.g.*, *Hoiles v. Alioto*, 461 F.3d 1224, 1234 (10th Cir. 2006) (concluding that under Colorado choice-of-law rules, California had the "most significant relationship" in an action involving a California attorney's representation of a Colorado resident).

malpractice and for breach of an attorney's fiduciary duties is an attorney-client relationship or some other duty. *Slovensky v. Friedman*, 49 Cal. Rptr. 3d 60, 67 (Ct. App. 2006) (legal malpractice); *Fox v. Pollack*, 226 Cal. Rptr. 532, 534-35 (Ct. App. 1986) (breach of fiduciary duties).

a. *Attorney-client relationship*

An attorney-client relationship may be created by an express or implied contract. *Responsible Citizens v. Superior Court*, 20 Cal. Rptr. 2d 756, 765 (Ct. App. 1993). "No formal contract or arrangement or attorney fee is necessary to create the relationship of attorney and client. It is the fact of the relationship which is important." *Lister v. State Bar*, 800 P.2d 1232, 1237 (Cal. 1990) (quotations omitted). In determining the existence of an attorney-client relationship, we must consider the "totality of the circumstances." *Koo v. Rubio's Rests., Inc.*, 135 Cal Rptr. 2d 415, 425 (Ct. App. 2003) (quotations omitted). One party's subjective belief that an attorney-client relationship was formed is not sufficient. *Zenith Ins. Co. v. Cozen O'Connor*, 55 Cal. Rptr. 3d 911, 920 (Ct. App. 2007). "Instead, it is the intent and conduct of the parties that controls the question as to whether an attorney-client relationship has been created." *Id.*

"The question of whether an attorney-client relationship exists is one of law." *Responsible Citizens*, 20 Cal. Rptr. 2d at 766. "However, when the evidence is conflicting, the factual basis for the determination must be determined before the legal question is addressed." *Id.* Mr. Templeton does not contend there are factual disputes precluding summary judgment on this issue. We must therefore determine whether an

-46-

attorney-client relationship existed as a matter of law.

### i. Express contract

There was no express agreement for FF&S to represent Mr. Templeton in the Cordaro arbitration. Mr. Templeton acknowledges he never communicated directly with anyone at FF&S or received any legal advice from any of the attorney-defendants regarding the Cordaro matter. Mr. Templeton attempts to rely on an agency theory to establish an express agreement for FF&S to represent him. He argues FF&S manifested consent to represent him to both Catlin and Hall, who were acting as his agents under the Policy. But no evidence shows that either Catlin or Mr. Hall specifically entered into an agreement with FF&S for FF&S to represent Mr. Templeton.

Mr. Templeton relies mostly on communications between Mr. Hall and Mr. Rogers. These communications do not show FF&S explicitly and affirmatively agreed to represent Mr. Templeton. In fact, they show Catlin continuously objected to FF&S representing CapWest or Mr. Templeton under the Policy. None show that Catlin or Mr. Hall formally engaged FF&S to represent Mr. Templeton in the Cordaro arbitration.

Mr. Templeton also relies on Mr. Hall's communications with an FF&S legal assistant. Mr. Hall, in response to the assistant's email that Mr. Fehn asked her to convey that FF&S was not representing Mr. Templeton in the Cordaro matter, emailed the assistant, "We should be representing Daryl. I mentioned that to Tom [Fehn]. If we alienate Daryl our goose could be cooked." App. at 972-73. This exchange failed to establish that FF&S agreed to represent Mr. Templeton. Mr. Hall's subjective belief that

-47-

FF&S *should* be representing Mr. Templeton did not create an express agreement by FF&S to do so.

ii.  Implied contract

The evidence also does not support an implied agreement for FF&S to represent Mr. Templeton.  Mr. Templeton relies on (1) CapWest's deduction of attorney fees from his paycheck beginning in February 2010; (2) FF&S's attempt to negotiate a "global settlement" of CapWest's liability in a number of claims asserted against it, including the Cordaro matter, in September 2010; (3) Mr. Hall's representations to Mr. Templeton between February and March 2011 that FF&S was representing him; and (4) FF&S's attempt to include Mr. Templeton in the settlement agreement with the Cordaros and acknowledgement that it needed to include him.  None of the foregoing establish that FF&S intended to represent Mr. Templeton.  Without evidence of FF&S's intent to enter into an agreement, we cannot recognize an implied attorney-client relationship.  *See Zenith*, 55 Cal. Rptr. 3d at 920 (explaining that "[a]n implied contract, in no less degree than an express contract, must be founded upon an ascertained agreement of the parties to perform it" (quotations and alterations omitted)).

First, CapWest's deduction of attorney fees from Mr. Templeton's paycheck does not establish an implied agreement for FF&S to represent Mr. Templeton.  There is no indication CapWest used these fees to pay for FF&S's services.  When Mr. Templeton left CapWest in August 2010, he stopped paying his share of legal fees.  At that time, Markun Zusman was still Mr. Templeton's and CapWest's retained counsel under the

Policy. Mr. Templeton did not pay any legal fees in 2011—the time he contends FF&S was retained as his attorney. Further, the fees Mr. Templeton paid were pursuant to a reimbursement provision in his independent contractor agreement with CapWest. In *Zenith*, the court rejected that fees paid through a reimbursement agreement with the law firm's client created an implied attorney-client relationship. *Id.* at 921. As in *Zenith*, Mr. Templeton's reimbursement agreement with CapWest does not show FF&S agreed to represent him.

Second, a timing problem prevents Mr. Templeton from establishing an implied agreement based on FF&S's attempt to negotiate a global settlement that included the Cordaros' claim. FF&S attempted to negotiate this global settlement in September 2010, when Markun Zusman was still representing him and CapWest under the Policy. There is no indication that Mr. Templeton, FF&S, CapWest, or Catlin believed FF&S was representing Mr. Templeton at that time. Rather, FF&S was serving as CapWest's general counsel in attempting to settle the matters pending against it.

Third, neither Mr. Hall's representations to Mr. Templeton nor Mr. Hall's belief that FF&S was representing Mr. Templeton and CapWest are relevant because they do not establish that FF&S impliedly undertook to represent Mr. Templeton in the Cordaro matter. Mr. Hall worked for CapWest—not FF&S. His statements and beliefs do not show that FF&S agreed to represent Mr. Templeton. *See id.* at 920.

Fourth, FF&S's attempt to include Mr. Templeton in the settlement agreement with the Cordaros and acknowledgement that it needed to include him do not establish an

-49-

implied attorney-client relationship. FF&S's actions are consistent with its role as CapWest's general counsel. Mr. Hall obtained $15,000 settlement authority for the Cordaro matter from Catlin. FF&S was aware that both Mr. Templeton and CapWest were insured under the Policy. Ms. Davidi's attempt to include Mr. Templeton in the settlement agreement and Mr. Fehn's statement that he knew Mr. Templeton "had to be part of the deal," App. at 1014, merely show that FF&S knew it could not serve CapWest's interests without negotiating a release for Mr. Templeton. They do not establish that FF&S agreed to represent Mr. Templeton as his attorney.

\* \* \* \*

The undisputed facts do not establish an express or implied attorney-client relationship between Mr. Templeton and the attorney-defendants. Accordingly, the district court properly granted summary judgment to the attorney-defendants on this basis.

b. *Duty to a non-client*

Mr. Templeton argues the attorney-defendants owed him a legal duty even if he was not their client. He relies on *Biakanja v. Irving*, 320 P.2d 16 (Cal. 1958), and *Lucas v. Hamm*, 364 P.2d 685 (Cal. 1961). We conclude these and related California cases do not reach as far as Mr. Templeton contends. To recognize a duty from an attorney to a non-client, these cases require, among other things, that the attorney and his or her client mutually intend that the primary purpose of the attorney's services is to benefit the non-client. The undisputed facts here fall short of meeting this standard.

i. California case law

"[A]n attorney will normally be held liable for malpractice only to the client with whom the attorney stands in privity of contract, and not to third parties." *Borissoff v. Taylor & Faust*, 93 P.3d 337, 340 (Cal. 2004).[22] In *Biakanja*, however, the California Supreme Court established that, in limited circumstances, a professional may owe a legal duty to a third party in the absence of privity of contract between them. 320 P.2d at 17-19. In *Lucas*, the court recognized attorneys can have a duty to non-clients. 364 P.2d at 688. The *Biakanja* court listed factors to consider in assessing whether to impose a duty. 320 P.2d at 17-19. Under this balancing test, courts must consider:

> [T]he extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.

*Id.* at 19. When the defendant is an attorney, the court must also consider whether recognition of liability "would impose an undue burden on the profession." *Lucas*, 364 P.2d at 688.

---

[22] *See also Schick v. Lerner*, 238 Cal. Rptr. 902, 907 (Ct. App. 1987) ("An attorney generally will not be held liable to a third person not in privity of contract with him [or her] since he [or she] owes no duty to anyone other than his [or her] client."); *St. Paul Title Co. v. Meier*, 226 Cal. Rptr. 538, 539 (Ct. App. 1986) ("An attorney's liability for professional negligence does not ordinarily extend beyond the client except in limited circumstances."); *Fox*, 226 Cal. Rptr. at 534 ("With certain exceptions, an attorney has no obligation to a non-client for the consequences of professional negligence . . . .").

Under the *Biakanja/Lucas* test, "[t]he predominant inquiry . . . is whether the principal purpose of the attorney's retention is to provide legal services for the benefit of the plaintiff." *Goldberg v. Frye*, 266 Cal. Rptr. 483, 489 (Ct. App. 1990). To establish a duty, both the attorney and the client must have intended the third party to be the beneficiary of the attorney's legal services. *See Zenith*, 55 Cal. Rptr. 3d at 919 (explaining that "[t]he clear absence of this mutual intent requirement is critical, indeed dispositive," because "[a]n attorney's undertaking should be the result of a conscious decision, so that the consequences of a duty to a third person can be considered and the undertaking declined if the risk of conflicts or financial exposure is too great"); *see also Bily v. Arthur Young & Co.*, 834 P.2d 745, 771 (Cal. 1992) ("California courts have consistently required some manifestation on the part of a professional . . . that he or she is acting to benefit a third party . . . in a specific and circumscribed transaction."). "The existence of such a duty is a question of law dependent upon 'a judicial weighing of the policy considerations for and against the imposition of liability under the circumstances.'" *Fox*, 226 Cal. Rptr. at 535 (quoting *Goodman v. Kennedy*, 556 P.2d 737, 742 (Cal. 1976)).[23]

---

[23] "Courts have generally disregarded the 'moral blame' factor [mentioned in *Biakanja*] in evaluating an attorney's duty to a nonclient." *Chang v. Lederman*, 90 Cal. Rptr. 3d 758, 771 n.7 (Ct. App. 2009); *see also Osornio v. Weingarten*, 21 Cal. Rptr. 3d 246, 255 n.15 (Ct. App. 2004) ("Our conclusion from a review of the California cases addressing the issue of an attorney's duty to third parties is that courts often recite this 'moral blame' factor mentioned in *Biakanja* but rarely apply it as part of their analysis.").

In *Biakanja*, a non-attorney notary prepared a will for the plaintiff's brother, which left the testator's entire estate to the plaintiff. 320 P.2d at 17-18. The will was declared invalid based on the notary's negligence, and the testator's estate went into intestate succession. *Id.* The plaintiff sued the notary for negligence. *Id.* The notary argued he was not liable to the plaintiff because there was privity of contract only between the notary and the testator. *Id.* The court rejected the notary's argument, concluding the notary owed the plaintiff a duty of care, which he had clearly breached. *Id.* In so holding, the court was careful not to create a broad scope of liability for any person who may receive a benefit under a contract. *Id.* Instead, the court enumerated the factors listed above, and explained that the factors weighed in favor of imposing a duty against the notary. *Id.* at 19. The court emphasized that the "end and aim" of the testator's transaction with the notary was to benefit the plaintiff and the plaintiff's injury from the notary's negligence was clearly foreseeable. *Id.*

In *Lucas*, the court faced a situation almost identical to *Biakanja* except the drafter of the will was an attorney. 364 P.2d at 686-87. The court followed *Biakanja* and concluded the imposition of a duty in the absence of privity was equally applicable against the attorney, whose negligent drafting of the will reduced the plaintiffs' share of the testator's estate. *Id.* at 688. The court also considered whether recognizing liability under the circumstances would impose an undue burden on the legal profession, but concluded it would not. *Id.* It concluded imposing a duty was proper in this case because "a contrary conclusion would cause the innocent beneficiary to bear the loss." *Id.*

-53-

Following *Lucas*, California courts have imposed a duty on attorneys to third

parties in other circumstances, but only where the attorney and client intended the

attorneys' services to directly benefit the third party and it was reasonably foreseeable

that attorney negligence would potentially harm the third party.[24] California courts have

declined to impose a duty to third parties on attorneys where the attorney and client did

not intend for the attorney's services to directly benefit the third party, harm to the third

party was not foreseeable, or policy considerations weighed against imposing a duty.[25]

---

[24] *See, e.g.*, *Osornio*, 21 Cal. Rptr. 3d at 263-70 (recognizing the right of an intended beneficiary, a dependent adult who was under the care of the testator, to pursue a malpractice action against the attorney who drafted the testator's will naming the plaintiff as the executor and sole beneficiary of the will because the attorney negligently failed to advise the testator that his intended beneficiary was a presumptively disqualified donee under the probate code); *Meighan v. Shore*, 40 Cal. Rptr. 2d 744, 755 (Ct. App. 1995) (concluding that a personal injury attorney had a duty to notify his client's wife of her potential loss of consortium claim where both spouses consulted the attorney with respect to a personal injury suffered by the husband and the attorney knew that the wife had a potential claim); *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz*, 128 Cal. Rptr. 901, 905-06 (Ct. App. 1976) (recognizing the right of a third party lender to bring a negligence action against an attorney who issued a written opinion containing incorrect information to a client, which the attorney knew would be transmitted to and relied upon by prospective lenders); *Donald v. Garry*, 97 Cal. Rptr. 191, 191 (Ct. App. 1971) (recognizing the right of a creditor, who assigned the collection of a debt owed to it to a collection agency, to bring a negligence action against the collection agency's attorney who allowed a case based on the debt to be dismissed for lack of prosecution).

[25] *See, e.g.*, *Chang*, 90 Cal. Rptr. 3d at 773-74 (concluding a testator's attorney, who allegedly was directed to revise the testator's will to increase his wife's share of the estate, owed no duty to the testator's wife to make the requested revisions); *Burger v. Pond*, 273 Cal. Rptr. 709, 714-16 (Ct. App. 1990) (concluding that a divorce attorney had no duty to his client's prospective second wife for his alleged negligence in handling the client's divorce from his first wife, even though the attorney was aware of their marriage plans); *Fox*, 226 Cal. Rptr. at 535-36 (concluding an attorney hired by one party in a real

Continued . . .

For example, in *Goodman*, the California Supreme Court declined to extend a duty to third parties who purchased a corporation's stock from the defendant-attorney's clients. 556 P.2d at 739-44. The attorrey had allegedly negligently advised his clients that they could issue and sell stocks without jeopardizing the corporation's exemptions from registration under securities laws. *Id.* The court found *Biakanja* and *Lucas* inapplicable because the attorney had no relationship with the plaintiffs. *Id.* Also, there was no indication the advice was communicated to the plaintiffs or that they acted upon it, or that the attorney knew or should have known that it would be. *Id.* Moreover, unlike in the cases involving will beneficiaries, the clients did not intend to confer a benefit on the plaintiffs. *Id.* The court further explained that imposing a duty would be an undue burden on the legal profession because an attorney would become unduly preoccupied with "the possibility of claims based on mere negligence . . . by any with whom his client might deal," which would "prevent him from devoting his entire energies to his client's interests." *Id.* at 743 (quotations omitted).

These cases illustrate that attorneys owe a duty of care to non-clients in limited circumstances. California courts have primarily extended a duty to intended beneficiaries

estate transaction has no duty to an unrepresented, adverse party to the transaction); *Mason v. Levy & Van Bourg*, 143 Cal Rptr. 389, 393 (Ct. App. 1978) (concluding an attorney who had a contractual right to a percentage of a contingency fee under a referral agreement had no right to sue the successor attorney to whom he referred the case for negligence in failing to prosecute the lawsuit because the client's intention in instituting the lawsuit and transferring it to the successor attorney was not to benefit the first attorney).

in the estate planning context, where the client cannot enforce his or her own rights after he or she dies. Beyond that context, in all of the cases where courts have extended a duty to non-clients, the client's and third party's interests are aligned. In fact, courts have declined to extend a duty where the interests of the client and third party are potentially adverse. *See Zenith*, 55 Cal. Rptr. 3d at 919 ("[The defendant] thus cannot be held to be under a duty to protect the interests of Zenith, a nonclient, where, as here, the nonclient's interests were, at the very least, potentially adverse to those of the client.").[26]

---

[26] *See also Hall v. Superior Court*, 133 Cal. Rptr. 2d 806, 811-12 (Ct. App. 2003) (concluding an attorney, who represented a client in a wrongful death action against her estranged husband's mother for the death of the client's child, had no duty to his client's husband based, in part, on a potential conflict of interest between the husband and wife); *Skarbrevik v. Cohen, England & Whitfield*, 282 Cal. Rptr. 627, 634-36 (Ct. App. 1991) (concluding an attorney representing a corporation had no duty to a minority shareholder because the minority shareholder's interests were at least potentially adverse to the client the attorney was advising); *Schick*, 238 Cal. Rptr. at 908-09 (concluding an attorney retained by a psychologist to advise him regarding revealing confidential information about a patient in a legal action brought by the patient's former partner seeking financial support from the patient, had no duty to the psychologist's patient because the attorney was not retained to protect the patient's rights, but rather to provide the psychologist legal advice that was potentially adverse to the patient); *Fox*, 226 Cal. Rptr. at 535 ("[A]n attorney has no duty to protect the interests of an adverse party for the obvious reasons that the adverse party is not the intended beneficiary of the attorney's services, and that the attorney's undivided loyalty belongs to the client." (citations omitted)); *St. Paul Title Co.*, 226 Cal. Rptr. at 540 (concluding an attorney for the purchaser in a real estate transaction owed no duty to the escrow agent for providing negligent advice to the purchaser concerning escrow instructions, in part, because the attorney owed a duty of undivided loyalty to his client and imposing a duty to third parties in the transaction would potentially interfere with that duty).

ii.  <u>Analysis</u>

This case falls outside the limited circumstances in which California courts have imposed a duty on attorneys to non-clients.  We decline to stretch California precedent to recognize a duty under the circumstances here.  *See Meighan*, 40 Cal. Rptr. 2d at 753 (explaining that California courts routinely "refuse to find duty in fact settings clearly outside the *Biakanja* criteria").

The *Biakanja/Lucas* factors do not favor imposing a duty on the attorney-defendants.  Most importantly, the facts do not show that Mr. Templeton was an intended beneficiary of the attorney-defendants' services.  The attorney-defendants and CapWest's primary purpose for engaging in settlement negotiations with the Cordaros was to benefit CapWest, not Mr. Templeton.  Their intention was to negotiate an agreement to resolve CapWest's liability in the Cordaro matter.[27]  The attorney-defendants attempted to include Mr. Templeton in the settlement to benefit CapWest.  That Mr. Templeton also

---

[27] That Mr. Hall stated that the attorney-defendants "should be representing" Mr. Templeton is entirely consistent with this conclusion.  App. at 972-73.  Mr. Hall was concerned that leaving Mr. Templeton out of the settlement would prevent settling the Cordaros' claim against CapWest.  Thus, CapWest's "end and aim" of retaining the attorney-defendants was to resolve its liability in the Cordaro matter, not to benefit Mr. Templeton.  *Biakanja*, 320 P.2d at 19.  Further, even if CapWest intended in part for Mr. Templeton to benefit from the attorney-defendants' services, there is no evidence the attorney-defendants intended to perform their services for the benefit of Mr. Templeton.  *See Zenith*, 55 Cal. Rptr. 3d at 918-19.

might have stood to benefit from the attorney-defendants' negotiations does not alone give rise to a duty.[28]

Additionally, imposing a duty here would likely impose an undue burden on attorneys. As in *Goodman*, imposing such a duty might interfere with the attorney's obligations to his or her own client. *See Goodman*, 556 P.2d at 743. Policy considerations against imposing a duty to a non-client are strongest where, as here, doing so creates a risk of detracting from the attorney's representation of his or her client because of potentially conflicting interests between the client and third party. *See, e.g.*, *Moore v. Anderson Zeigler Disharoon Gallagher & Gray, P.C.*, 135 Cal. Rptr. 2d 888, 898-99 (Ct. App. 2003); *Zenith*, 55 Cal. Rptr. 3d at 918-19; *Fox*, 226 Cal. Rptr. at 535-36. A conflict of interest may arise whenever the interests of the client and third party are not entirely aligned. *See Zenith*, 55 Cal. Rptr. 3d at 919; *Skarbrevik*, 282 Cal. Rptr. at 634-36. Here, as explained above, Mr. Templeton's and CapWest's interests were adverse because Mr. Templeton's liability was potentially greater than that of CapWest.

---

[28] At most, Mr. Templeton would have been an incidental beneficiary of the attorney-defendants' settlement negotiations with the Cordaros, "and an incidental benefit does not suffice to impose a duty upon the attorney." *Goldberg*, 266 Cal. Rptr. at 489 (quotations and alterations omitted); *see also id.* (explaining that in numerous instances representation of a client will affect third parties, but that "[t]he fact that third parties are thus benefited, or damaged, by the attorney's performance does not give rise to a duty by the attorney to such third parties").

These policy concerns weigh against imposing a duty to a non-client under the facts of this case.[29]

Because the facts do not support imposing a duty on the attorney-defendants in the absence of an attorney-client relationship, the trial court properly granted summary judgment on this theory as well.

\* \* \* \*

Accordingly, the district court properly granted summary judgment to the attorney-defendants on Mr. Templeton's legal malpractice and breach of fiduciary duties claims.[30]

## III. **CONCLUSION**

Based on the foregoing, we affirm the district court with the exception of part of its grant of summary judgment to Catlin on Mr. Templeton's duty-to-defend claim. On that claim, we reverse the district court's grant of summary judgment to Catlin for the

---

[29] Although we doubt the attorney-defendants could have foreseen the harm that ultimately befell Mr. Templeton, foreseeability alone is insufficient to impose liability. *See Zenith*, 55 Cal. Rptr. 3d at 918; *Schick*, 238 Cal. Rptr. at 909. By the same token, the degree of certainty Mr. Templeton would suffer the injury he sustained, the "closeness of the connection" between the attorney-defendants' conduct and Mr. Templeton's injury, and the deterrent to future harm in similar circumstances do not militate in favor of imposing a duty here because the fact Mr. Templeton was not an intended beneficiary of the attorney-defendants' services and policy considerations strongly counsel against imposing a duty.

[30] The court also properly granted summary judgment to the attorney-defendants on Mr. Templeton's claim for exemplary damages based on the absence of any underlying liability.

-59-

period of time leading up to and during the FINRA arbitration.  We remand to the district court for further proceedings consistent with this opinion, including resolution of Mr. Hall's request for costs and attorney fees for defending this appeal.

ENTERED FOR THE COURT

Scott M. Matheson, Jr.
Circuit Judge